UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PURE DATA SYSTEMS, LLC,

        Plaintiff,

    v.

UBISOFT, INC.,

        Defendant.

Case No. 18-cv-00852-JCS

**ORDER RE DEFENDANT'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

Re: Dkt. No. 28

## I.    INTRODUCTION

Plaintiff Pure Data Systems, LLC ("PDS") filed this case against Defendant Ubisoft, Inc. alleging that Ubisoft directly and indirectly infringed the claims of two patents that PDS owns, U.S. Patent Nos. 5,999,947 (the "'947 patent") and 6,321,236 (the "'236 patent").[1]  The patents relate to a method of and system for distributing differences between data storage systems. Ubisoft moves to dismiss PDS's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  First, Ubisoft argues that the patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Second, Ubisoft argues that PDS's claims of indirect infringement under 35 U.S.C. § 271(b) and § 271(c) lack a plausible allegation that Ubisoft had knowledge of the infringing acts.  The Court held a hearing on July 13, 2018.  For the reasons stated below, Ubisoft's motion to dismiss is DENIED IN PART and GRANTED IN PART.  PDS may proceed on its claims for direct infringement but its indirect infringement claims are dismissed with leave to amend.[2]

---

[1] The '947 patent is available in the record as Exhibit A to PDS's complaint (dkt. 1-1) and as Exhibit A to PDS's opposition (dkt. 42-1).  The '236 patent is available in the record as Exhibit B to the complaint (dkt. 1-2) and as Exhibit C to PDS's opposition (dkt. 42-3).

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).  *See* dkts. 9, 15.

## II. BACKGROUND

### A. The '947 Patent

#### 1. Overview

The '947 patent was filed on May 27, 1997 and covers a "method of distributing database differences." '947 Patent (cover page paragraph [22]); Compl. (dkt. 1) ¶ 18. Specifically, the '947 patent concerns a "method, computer program product, and system that allows changes made to an original database table found on a server computer to be reflected in client copies of the database table based on intermittent client requests for synchronization." '947 Patent (cover page paragraph [57]). In other words, a client computer that maintains a local copy of a database can receive updates on demand from a server, and the server will transmit only the changes to the database since that client last received an update, without needing to transmit data that has not changed. PDS claims the invention solves a "problem unique to data storage systems, by greatly enhancing and facilitating the operation and efficiency of data storage systems." Compl. ¶ 2. For example, the invention improves the functioning of data storage systems by "efficiently using system resources and permitting client systems that are intermittently (as opposed to continuously) connected to a server system to synchronize with information from the server." *Id.* ¶ 3 (citing '947 Patent at 1:9–19).

#### 2. Claims

The '947 patent includes fourteen claims. '947 Patent at (cover page paragraph [57]). PDS alleges in this action that Ubisoft, a video game company, directly infringes Claim 6 of the '947 patent in Ubisoft's game library updates, game statistics updates, and game updates. *Id.* ¶¶ 20–21, 27–29, 35, 38, 45. PDS also alleges that Ubisoft is "indirectly infringing one or more claims" of the '947 patent. *Id.* ¶ 19. In its opposition brief, PDS seeks to reserve the right to assert additional claims, such as those dependent on the asserted claim, like Claims 8 and 9. Opp'n (dkt. 42) at 7. All three claims are addressed below.

##### a. Claim 6

Claim 6 reads as follows:

2

A method of distributing database differences corresponding to database change events made to a database table located on a server computer to client copies of the database table located on one or more client computers, each client computer capable of having different database engines comprising the steps of:

storing database differences at the server computer in a generic format;

receiving from a client computer a request for all database differences needed to make a client copy of the database table current;

translating the differences from the generic format into instructions having a specific format compatible with the type of database engine associated with the client copy of the database table; and

transmitting the instructions to the client computer for execution on the client database engine to make the client copy of the database table current.

'947 Patent at 15:29–47.

### b. Dependent Claims 8 and 9

Claim 8 adds a limitation to Claim 6 as follows:

A method as recited in Claim 6 wherein the type of database engine is ascertained by reference to profile information regarding the client computer.

*Id.* at 15:49–51. Claim 9 recites additions to Claim 6 comprising the steps of:

creating and storing on the server computer one or more sequentially versioned updates containing database differences corresponding to database change events made to the database table since the preceding update;

determining which updates are necessary for making the client copy of the database table current; and

generating the database differences based upon the necessary updates prior to the step of translating the differences into instructions.

*Id.* at 15:54–16:7.

### 3. Prior Art Acknowledged in the '947 Patent

The '947 patent acknowledges that, in the prior art, "[o]ne way to distribute changes made to a database or database table is to download the entire table each time a client makes a connection with the server." *Id.* at 2:1–3. However, the '947 patent states that this requires "large

3

amounts of bandwidth on the communications link" and "will make for an expensive and time consuming transfer that, in many instances, will be intolerable and impracticable." *Id.* at 2:5–8. Additionally, the '947 patent acknowledges another prior art system that "make[s] a comparison of the client representation of the database (or other form of data store) and the original database on the server at the time that the client makes a connection with the server." *Id.* at 2:9–12. According to the '947 patent, however, "[s]uch dynamic comparisons require large amounts of hand shaking and data transfer between the client and the server." *Id.* at 2:12–14.

PDS claims that the '947 patent survived "a rigorous examination that lasted more than 2.5 years."[3] Opp'n at 5. According to PDS, during prosecution of the application, the Examiner at the United States Patent and Trademark Office ("USPTO") attempted to apply as prior art U.S. Patent No. 5,758,355 ("Buchanan") to the pending claims. Compl. ¶ 5. PDS states that the '947 patent was distinguished on the grounds that Buchanan "merely discloses the concept of bi-directional synchronization of a client database and a server database, and does not make any reference to translating database differences at a particular data format." *Id.* Additionally, PDS alleges that the USPTO attempted to apply as prior art U.S. Patent No. 5,634,052 ("Morris"). *Id.* ¶ 6. PDS states that the '947 patent was distinguished because where the Morris system transmits database differences from the client to the server, the '947 patent transmits database differences from the server to the client, "which enables the client computer to maintain an updated copy of a database table stored at the server." *Id.*

**B. The '236 Patent**

**1. Overview**

The '236 patent was filed on August 3, 1999 as a continuation of the '947 patent application. '236 Patent (cover page paragraph [22]), 1:8–11. The '236 patent covers a "system for distributing database differences" and shares "a nearly identical specification" with the '947 patent. Compl. ¶ 49; Opp'n at 4 n.2.

---

[3] Excerpts from the prosecution history of the '947 patent are available in the record as Exhibit B to PDS's opposition (dkt. 42-2).

### 2. Claims

The '236 patent includes seventeen claims. '236 Patent (cover page paragraph [57]). PDS alleges the direct infringement of Claim 1. Compl. ¶¶ 52, 59, 61, 75. As with Claim 6 of the '947 patent, PDS alleges that Ubisoft directly infringes Claim 1 in its game library updates, game statistics updates, and game updates. *Id.* ¶¶ 51, 60, 68. PDS also alleges that Ubisoft is "indirectly infringing one or more claims" of the '236 patent. *Id.* ¶ 50.

Claim 1 reads as follows:

> A system for distributing differences corresponding to one or more change events made to a data store located on a server computer, the differences being distributed to one or more client copies of at least a portion of the data store, wherein the one or more client copies of the at least a portion of the data store are located on one or more client computers, the system comprising:
>
> a current server version of the data store configured to permit modifications to data contained therein;
>
> a reference server version of the data store;
>
> a differencing engine that identifies, at a given instance in time, any differences between the current server version of the data store and the reference server version of the data store;
>
> one or more updates storing one or more differences generated by the differencing engine wherein the one or more differences are in a first format;
>
> a translator that converts any differences destined for the client copy of the at least a portion of the data store from the first format into a second format;
>
> a communication network; and
>
> a synchronizer that obtains from the differencing engine any differences that are needed to make the one or more client copies of the at least a portion of the data store current, and transmits the differences to the one or more client copies of the at least a portion of the data store by way of the communication network.

'236 Patent at 14:63–15:22.

### 3. Prior Art Acknowledged in the '236 Patent

The '236 patent acknowledges the same prior art as the '947 patent. *Id.* at 2:5–21. PDS alleges that, similar to the '947 patent, the '236 patent "survived a rigorous examination that lasted

over two years."[4]  Opp'n at 5.  According to PDS, during prosecution of the application, as with

the '947 patent, the USPTO attempted to apply Buchanan as prior art.  Compl. ¶ 5.  PDS states

that Buchanan was again distinguished on the basis that Buchanan "does not disclose a database

with a translated format."  *Id.*  Additionally, PDS alleges that the USPTO attempted to apply as

prior art U.S. Patent No. 5,870,765 ("Bauer").  *Id.* ¶ 7.  PDS states that the pending claims were

distinguished "on the basis that they are directly opposed to the disclosure of the Bauer patent."

*Id.*

### C.    The Present Motion and the Parties' Arguments

#### 1.    Ubisoft's Motion

Ubisoft argues that Claim 6 of the '947 patent and Claim 1 of the '236 patent (collectively

"the asserted claims") constitute patent-ineligible subject matter pursuant to the two-part test set

forth in *Alice Corporation Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347, 2355 (2014).

Mot. (dkt. 28) at 4.  Under step one, Ubisoft contends that the asserted claims are directed to the

abstract ideas of updating and translating, and that "updating changed information in an

understandable format is a long known and conventional practice."  *Id.* at 5–12.  To support this

position, Ubisoft analogizes the asserted claims to conventional real-world practices that it asserts

are used by case law reporters and field salespersons.  *Id.*  Furthermore, Ubisoft points to cases

that hold "updating" or "translating" data to be abstract ideas.  *Id.* at 12–15 (citing, *e.g.*, *White*

*Knuckle Gaming, LLC v. Elec. Arts Inc.*, No. 1:15-CV-150-JNP-PMW, 2016 WL 3129133 (D.

Utah June 2, 2016), *aff'd*, 683 F. App'x 931 (Fed. Cir. 2017); *Yodlee, Inc. v. Plaid Techs. Inc.*, No.

14-1445 (LPS), 2016 WL 2982503 (D. Del. May 23, 2016)).  At step two, Ubisoft argues that the

asserted claims do not add an inventive concept but merely recite generic computer components to

perform the abstract ideas.  *Id.* at 15–24.

Additionally, Ubisoft moves to dismiss PDS's allegations of indirect infringement, arguing

that Ubisoft fails to allege plausibly that Ubisoft had knowledge of its infringing acts while the

patents were in force, as 35 U.S.C. § 271(b) and § 271(c) require.  *Id.* at 24–25.

---

[4] Excerpts from the prosecution history of the '236 patent are available in the record as Exhibit D
to PDS's opposition (dkt. 42-4).

### 2. PDS's Opposition

PDS responds by arguing that Ubisoft fails to meet its "heavy burden of proving, by clear and convincing evidence," that the asserted claims are directed to ineligible subject matter. Opp'n at 1, 8. In a footnote, PDS also submits that this Court lacks subject-matter jurisdiction to consider a § 101 eligibility challenge, stating that § 101 is not one of the defenses in 35 U.S.C. § 282(b) authorized to be raised in a patent infringement action. *Id.* at 8 n.4.

Under *Alice*, PDS argues that the asserted claims are not directed to an abstract idea under step one but rather improve on an existing technological process. *Id.* at 13 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). Moreover, PDS contends that Ubisoft oversimplifies the patents in its characterizations of the abstract concepts. *Id.* at 12–13.

Next, PDS argues that, if the Court were to reach step two of the *Alice* test, the asserted claims embody an inventive concept because "[t]he limitations of the claims, taken together as an ordered combination, teach the inventive concept of allowing client representations of a data store to be managed by a different type of data store engine than that managing the server data store." *Id.* at 14–16. Furthermore, PDS argues that Ubisoft fails to meet its heavy burden of proving by clear and convincing evidence that the claims' combination of elements is "well-understood, routine and conventional to a skilled artisan in the relevant field." *Id.* at 17–18 (quoting *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018)). To support this argument, PDS points to a USPTO memorandum of changes in examination procedure issued in light of the recent *Berkheimer* ruling.[5] *Id.*

According to PDS, three Federal Circuit cases support its position that the asserted claims are patent eligible. *Id.* at 18–20 (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014); *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016)).

Finally, PDS urges this Court to limit its analysis and ruling to the two asserted claims, and seeks to reserve the right to assert additional claims for infringement contentions, with Claims 8

---

[5] This memorandum, referred to as the "Berkheimer Memo," is available in the record as Exhibit E to PDS's opposition (dkt. 42-5).

and 9 of the '947 patent given as examples. Opp'n at 6–7.

### 3. Ubisoft's Reply

In its reply, Ubisoft maintains that the record demonstrates clearly and convincingly that the asserted claims are directed to mere abstract ideas and are not patent eligible. Reply (dkt. 47) at 1–2. With respect to Claims 8 and 9 of the '947 patent, Ubisoft responds that PDS has not affirmatively alleged infringement of these additional claims, but that regardless they fail the *Alice* test as additional abstract ideas without any inventive concepts. *Id.* at 2 n.2.

Under the first step of the *Alice* test, Ubisoft argues that PDS implicitly concedes that the claims are directed to abstract ideas by failing to challenge its conventional real-world examples and not addressing its proffered case law. *Id.* at 3–5. Under step two, Ubisoft argues that the claims only describe *what* the invention is to do, but not *how*, and therefore fail to teach an inventive concept. *Id.* at 5–7. It is this lack of an inventive concept, Ubisoft contends, that distinguishes this case from *DDR Holdings*, *BASCOM*, and *Amdocs*. *Id.* at 7–8. Additionally, Ubisoft rejects PDS's contention that *Berkheimer* requires an expert report to resolve an *Alice* motion, citing recent authority for support. *Id.* at 1 n.1, 8–9 (citing, *e.g.*, *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1386 (Fed. Cir. 2018)).

Finally, Ubisoft notes that PDS did not respond to its motion to dismiss the indirect infringement claims, and argues that these claims should therefore be dismissed. *Id.* at 9–10.

## III. ANALYSIS

### A. Legal Standard Under Rule 12(b)(6)

Ubisoft moves to dismiss PDS's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take "all allegations of material fact in the complaint as true and construe them in the light most favorable to the non-moving party." *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Although a complaint "need not contain detailed factual allegations," it must "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061,

1065 (9th Cir. 2008) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). In a patent eligibility challenge under 35 U.S.C. § 101, however, it is the legal sufficiency of the patent— rather than of the complaint itself—that is at issue.

It is well settled that courts may determine patent eligibility under § 101 at the Rule 12(b)(6) stage. *See generally, e.g.*, *Voter Verified*, 887 F.3d at 1386 (Fed. Cir. 2018) (affirming determination of ineligibility on a motion to dismiss under Rule 12(b)(6)); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1380 (Fed. Cir. 2016) (same); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N. A.*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) (same).[6] Indeed, there are many virtues of "addressing section 101 at the outset of litigation," such as doctrinal justifications based on "the section 101 determination bear[ing] some of the hallmarks of a jurisdictional inquiry," and practical benefits including conversation of resources for litigants as well as the judiciary. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718–19 (Fed. Cir. 2014) (Mayer, J., concurring).

Judgment on the pleadings is possible, however, "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). The Federal Circuit's recent decision in *Berkheimer* recognized that patent eligibility is "a question of law that may contain underlying issues of fact." *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 992 (Fed. Cir. 2018) (citing *Berkheimer*, 881 F.3d at 1368). For instance, "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact."[7] *Berkheimer*, 881 F.3d

---

[6] Likewise, there is no question that this Court has subject matter jurisdiction to consider a patent eligibility challenge. To hold otherwise would be to disregard the same precedents and many more. *See BASCOM*, 827 F.3d at 1347 ("The Supreme Court has also consistently held that § 101 provides a basis for a patentability/validity determination that is independent of—and on equal footing with—any other statutory patentability provision.").

[7] The *Berkheimer* court noted that these factual disputes are to apply the "clear and convincing" standard of proof. *Berkheimer*, 881 F.3d at 1368. This standard, however, is inapplicable to motions at the pleadings stage (such as this one) where no extrinsic evidence is considered and facts in dispute are viewed in the light most favorable to the non-moving party. *See Yodlee*, 2016 WL 2982503, at *2; *Blue Spike, LLC v. Google Inc.*, No. 14-1650 (YGR), 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. 14-0347 (DOC), 2015 WL 1239992, at *7–8 (C.D. Cal. Mar. 17, 2015).

at 1368.  However, this is not to say that § 101 challenges cannot be resolved on motions to dismiss where there exists no genuine dispute over the underlying facts.  *Id.* ("Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment.  Nothing in this decision should be viewed as casting doubt on the propriety of those cases."); *see also Automated Tracking Sols.*, 723 F. App'x at 995 (holding that because the plaintiff's complaint failed to support the contention that the patent involved a developing technology instead of well-understood, routine, and conventional systems, the fact was not in dispute).

### B.    Subject Matter Eligibility

#### 1.    *Alice* and § 101

Section 101 of the Patent Act defines what subject matter is eligible for patent protection. It provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  Implicit in this provision, however, is a well-established exception that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).  "[T]he concern that drives this exclusionary principle [is] one of pre-emption," because monopolization of abstract ideas "through grant of a patent might tend to impede innovation more than it would tend to promote it."  *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 70 (2012)).  At the same time, "an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Id.*  After all, "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Id.* (quoting *Mayo*, 566 U.S. at 71).

The Supreme Court in *Alice* set forth a framework to distinguish patent-ineligible subject matter that claims abstract ideas from "patent-eligible applications of those concepts."  *Id.* at 2355. Relying on its earlier *Mayo* decision, the Court articulated the two-step analysis as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. *Mayo*, 566 U.S. at 76-77. If so, we then ask, "[w]hat else is there in the claims before us?" *Id.* at 78. To

answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* at 79, 78. We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 82.

*Alice*, 134 S. Ct. at 2355 (brackets in original; format of internal citations modified).

In *Alice*, the claims at issue "relate[d] to a computerized scheme for mitigating 'settlement risk'—*i.e.*, the risk that only one party to an agreed-upon financial exchange will satisfy its obligation." *Id.* at 2352. To summarize in broad strokes, the patents described a system in which a third-party intermediary computer system would monitor the transaction parties' bank accounts, and would issue instructions to complete the transaction only if and when both parties were able to satisfy their obligations. *Id.* The Court held that "the concept of intermediated settlement is a fundamental economic practice long prevalent in our system of commerce," and that the patents at issue were therefore "directed to" an abstract idea for the purpose of the first *Mayo* step. *Id.* at 2356–57 (citations and internal quotation marks omitted).

At the second step, the *Alice* Court considered whether the patents at issue supplemented that abstract idea with an "inventive concept" sufficient to confer eligibility. *Id.* at 2357. Based on the principles that neither "[s]tating an abstract idea while adding the words 'apply it'" nor "limiting the use of an abstract idea to a particular technological environment" is enough, the Court held that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358 (citations and internal quotation marks omitted). The Court concluded that although the claimed method described the process in somewhat more detail—"[a]s stipulated, [it] require[d] the use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions"—all of the computer functions implicated were "well-understood, routine, conventional activities previously known to the industry" and required "no more than . . . a generic computer to perform generic computer functions." *Id.* at 2359 (citations, brackets, and internal quotation marks omitted). Because the patents did "not, for example, purport to improve the functioning of the computer itself [or] effect an improvement in any other technology or technical field," the Court held that they did not add an

11

inventive element to elevate the claims beyond ineligible abstract ideas. *Id.* at 2359–60. Accordingly, the Court affirmed the Federal Circuit's conclusion that the patents were invalid. *Id.* at 2360.

### 2. Abstract Ideas After *Alice*

The Supreme Court determined that it "need not labor to delimit the precise contours of the 'abstract ideas' category in [*Alice*]." *Id.* at 2357. In the years since, the Federal Circuit has had frequent occasion to consider, and give more definition to, the "abstract ideas" exception.

In *DDR Holdings*, the Federal Circuit found a patent directed to "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant" to be eligible subject matter. *DDR Holdings*, 773 F.3d at 1248. The court commented that "[a]lthough the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet." *Id.* at 1257. The court distinguished cases invalidating patents that "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet" on the basis that the patent at issue in *DDR Holdings* was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* Analyzing the claims under *Alice* step two, the court noted that when the claim limitations were taken together as an ordered combination, they recited an invention that was "not merely the routine or conventional use of the Internet." *Id.* However, the court cautioned that "not all claims purporting to address Internet-centric challenges are eligible for patent." *Id.* at 1258.

Conversely, in *Content Extraction*, the Federal Circuit held that patents describing a method of extracting, recognizing, and storing digital data from scanned hard copy documents were ineligible subject matter. *Content Extraction*, 776 F.3d at 1351. Under step one, the court characterized the claims as being drawn to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Id.* at 1347. Under step two, the court found no inventive concepts sufficient to save the patent, for "all of the additional limitations in the claims . . . recite well-known, routine, and conventional functions of scanners and computers." *Id.* at 1349.

The Federal Circuit's 2016 decision in *Enfish* determined patent eligibility under step one because the claims were not directed to an abstract idea. *Enfish*, 822 F.3d at 1336. There, the patents were directed to a "self-referential" logical model for a computer database designed to "improve the way a computer stores and retrieves data in memory." *Id.* at 1330, 1339. The court observed that the claims were directed to "a specific implementation of a solution to a problem in the software arts" as opposed to "a situation where general-purpose computer components [were] added post-hoc to a fundamental economic practice or mathematical equation." *Id.* at 1339.

Three recent Federal Circuit decisions rejecting district court ineligibility rulings also are informative. In *BASCOM*, the patent at issue was a "content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts." *BASCOM*, 827 F.3d at 1345. Under step one, the court concluded the claims were directed to the abstract idea of "filtering content." *Id.* at 1348. Under step two, however, the court found an inventive concept in the patent's "non-conventional and non-generic arrangement of known, conventional pieces," which therefore did not risk preempting "all ways of filtering content on the Internet." *Id.* at 1350. In *Amdocs*, the most relevant patent concerned a "system, method, and computer program for merging data in a network-based filtering and aggregating platform as well as a related apparatus for enhancing networking accounting data records." *Amdocs*, 841 F.3d at 1291. Accepting the district court's ruling that the claim was directed to an abstract concept, the Federal Circuit again conducted its analysis under step two. *Id.* at 1300. There, the need for an inventive concept was satisfied by the patent's "unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)." *Id.* Most recently, in *Berkheimer*, the patent at issue related to "digitally processing and archiving files in a digital asset management system" with a system that "parses files into multiple objects and tags the objects to create relationships between them." *Berkheimer*, 881 F.3d at 1362. At step one, the court held that the claims were directed to the abstract ideas of parsing, comparing, storing, and editing data. *Id.* at 1366. At step two, however, the court held that the district court's dismissal for patent ineligibility under § 101 was improper because a genuine issue of material fact existed over whether the claims improved the disclosed

13

archival system in an unconventional, inventive manner. *Id.* at 1370. Without deciding whether the claims were patent eligible, the court determined only that the record was insufficient to answer the presented factual questions, and therefore remanded the case for further proceedings. *Id.* at 1370–71.

In other recent cases applying this standard, the Federal Circuit has found claims patent ineligible. *See, e.g.*, *Voter Verified*, 887 F.3d at 1385–86 (finding claims directed to patent-ineligible subject matter); *Automated Tracking Sols.*, 723 F. App'x at 995 (same); *Elec. Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (same).

### C. Application to the Asserted Claims

For the purposes of this *Alice* analysis, the Court will consider the eligibility of the asserted claims (Claim 6 of the '947 patent and Claim 1 of the '236 patent) together.[8] While the '947 patent covers a "method" of distributing database differences and the '236 patent covers a "system" for distributing database differences, there is no distinction between them for § 101 purposes, as they recite the same concept. *See Alice*, 134 S. Ct. at 2360 ("[T]he system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."); *see also Voter Verified*, 887 F.3d at 1385. Indeed, both PDS's opposition and Ubisoft's reply present the claims' *Alice* analyses under a single framework as well. Opp'n at 11–20; Reply at 2–9.

#### 1. *Alice* Step 1: The Asserted Claims Are Directed to an Abstract Idea

Ubisoft contends that the asserted claims are directed to the abstract idea of "updating recipients with changed information in a format usable by the recipient." Mot. at 5–6. The Court agrees.

PDS rests the majority of its step one analysis on *Enfish* and argues that the claims are not directed to an abstract idea "but rather improve on an existing technological process." *Id.* at 11–13

---

[8] Because the Court holds that Ubisoft cannot establish on the pleadings that these claims are ineligible under § 101, the Court need not reach the question of whether, if the only claims identified in the complaint were ineligible, PDS could proceed based on other dependent claims not discussed in its complaint.

1    (citing *Enfish*, 822 F.3d at 1335–36).  In *Enfish*, the Federal Circuit found that the claims' specific

2    improvement to computer storage and memory, embodied in the unique "self-referential" data

3    structure, rendered the claims non-abstract.  *Enfish*, 822 F.3d at 1339.  ("In other words, we are

4    not faced with a situation where general-purpose computer components are added post-hoc to a

5    fundamental economic practice or mathematical equation.  Rather, the claims are directed to a

6    specific implementation of a solution to a problem in the software arts.").  But the court

7    recognized that "in other cases involving computer-related claims, there may be close calls about

8    how to characterize what the claims are directed to.  In such cases, an analysis of whether there are

9    arguably concrete improvements in the recited computer technology could take place under step

10   two."  *Id.*  Here, the asserted claims and their specific limitations are not "unambiguously directed

11   to an improvement in computer capabilities" nor do they "readily lend themselves to a step-one

12   finding that they are directed to a nonabstract idea."  *See BASCOM*, 827 F.3d at 1349 (citing

13   *Enfish*, 822 F.3d at 1335–40).  The Court, therefore, defers considerations of the claims' specific

14   improvements, or inventive concepts, for step two.

15        Generally, claims that encapsulate "longstanding commercial practice[s]," "method[s] of

16   organizing human activity," or "fundamental economic practice[s]" are found to be directed to the

17   abstract.  *See Alice*, 134 S. Ct. at 2356–57.  The real-world business examples that Ubisoft

18   analogizes to in its motion are persuasive, and PDS does nothing to distinguish them.  *See* Mot. at

19   7–12 (analogizing PDS's claims to the "pocket parts" practice of updating case law reporters

20   where only the new or changed information is published as well as to practices involving field

21   salespersons where businesses update them with only the new products or prices in advance of

22   customer meetings).  The specifications of the '947 and '236 patents themselves acknowledge this

23   field salesperson example, albeit in the different context of illustrating uses for the purported

24   invention, rather than discussing existing practices.  *See* '947 Patent at 1:54–67; '236 Patent at

25   1:58–2:4.  Moreover, beyond this concept of "updating," the Court has no difficulty concluding

26   that changing information into a format compatible for use by a recipient represents the abstract

27   idea of "translating."

28        Further, the Court is not persuaded by PDS's contentions that Ubisoft's characterizations

15

of its claims amount to oversimplifications for the purpose of step one. *See* Opp'n at 12–13. It is true that describing claims at too "high [a] level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. Here, however, the identified abstract concepts are not untethered from the language of the claims. Claim 6 of the '947 patent specifically calls out "translating" format differences, *see* '947 patent at 15:41–44, and its dependent claims refer to Claim 6's action as one of providing "updates." *See id.* at 15:54–16:7. In addition, courts have found patents that recite similar "update" or "translate" functions to be directed to abstract ideas on multiple occasions. *See White Knuckle Gaming*, 2016 WL 3129133, at *3 (finding a "simple internet-based method of updating the software of sports video games" to be an abstract idea); *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356, 366 (D. Del. 2015) (finding claims that generically recite the steps of "presenting," "sending," and "receiving" updates to be directed to an abstract idea); *Yodlee*, 2016 WL 2982503, at *25 (finding claims that use "broad, functional language" with focus on the "idea of translating data into a new form" to be abstract). Even taken together, the combined idea of "updating" plus "translating" still succumbs to the abstract. *See RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("Adding one abstract idea . . . to another abstract idea . . . does not render the claim non-abstract."). The claims at issue do not discuss the technological processes underlying the processes of transmitting updates or translating formats, and PDS does not meaningfully articulate how Ubisoft's general description of the asserted claims fails to capture any relevant part of them.

Finally, the fact that the asserted claims are directed to actions that "exist only in the context of computer-based systems," *see* Opp'n at 13, does not make the idea any less abstract. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment"). Accepting that the asserted claims are directed to an abstract idea, the Court turns to step two of the *Alice* test.

### 2. *Alice* Step 2: Ubisoft Has Not Shown the Asserted Claims Only Teach Well-Understood, Routine, or Conventional Solutions

Under step two, the Court must examine the elements of each claim "both individually and as an ordered combination" to determine whether the additional elements "contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible concept." *Alice*, 134 S. Ct. at 2355, 57 (citations and internal quotation marks omitted). These additional features must be more than "well-understood, routine, conventional activities previously known to the industry." *Id.* at 2359 (citations and internal quotation marks omitted).

The main thrust of Ubisoft's step two argument is that PDS's claims recite only the use of generic computer components in their generic functions to implement an abstract idea, and therefore lack an inventive concept. *See* Mot. at 15–23. In other words, the claims only describe "**what** the element is to do (e.g., translate from one format to another and translate), but not **how**." *See* Reply at 5. From the specifications it is clear, and PDS does not assert otherwise, that the claims' limitations, taken individually, recite only generic computer, network, and internet components. *See* '236 Patent at 14:63–15:22 (reciting a "server," a "differencing engine," a "translator," a "communication network," and a "synchronizer"). This, however, does not in itself defeat patent eligibility. Rather, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350; *see also DDR Holdings*, 773 F.3d at 1256–59; *Amdocs*, 841 F.3d at 1300–01. When Ubisoft attacks the "updating" or "translating" features independently, it fails to account for the combined arrangement. *Cf.* Mot. at 16–17. That the basic concept of "updating" may be abstract also does not address the particular method of providing updates described here—tracking changes made at different points in time, and sending on demand only the data that changed since a previous update. Thus, at issue here is whether PDS's claims *in their ordered combination of elements* are non-generic and non-conventional in the industry. This is a question of fact. *See Berkheimer*, 881 F.3d at 1369. At the hearing, counsel for Ubisoft focused on this argument that the patents fail step two because they do not call for more than generic computer technology, but did not meaningfully address the lack of proof at this stage as to whether the *activities* described in the patents were in fact "well-understood, routine, conventional[, and] previously known to the

17

industry." *See Alice*, 134 S. Ct. at 2359.

PDS alleges that its ordered combination of claim elements "presented new and unique advantages over the state of the art at the time," and that although its inventions "have by today been widely adopted by leading businesses, at the time of the invention, the technologies were innovative." Compl. ¶ 4. PDS therefore argues that the system and method described in its patents are not "'well-understood, routine and conventional to a skilled artisan in the relevant field.'" Opp'n at 17 (quoting *Berkheimer*, 881 F.3d at 1368).[9]

Ubisoft's primary argument to rebut PDS's allegation of novelty is that the Court can take judicial notice of what Ubisoft contends are analogous business practices outside of the digital realm: the use of "pocket parts" to supplemental legal reference books, and businesses providing updated catalog information to sales representatives in the field. Mot. at 7–11; Reply at 9. According to Ubisoft, the practice of using pocket parts is subject to judicial notice as a generally known fact not subject to reasonable dispute, and the salesperson analogy is discussed in the patent specifications themselves. Reply at 3–4 & n.4. Assuming for the sake of argument that pocket parts are in fact appropriate for judicial notice, the Court is not persuaded that its familiarity with that concept can suffice for a determination of what would have been well known to "a skilled artisan in the relevant field" at the time the patents were issued. *See Berkheimer*, 881 F.3d at 1368. Moreover, though helpful for informing the underlying business concept, the "pocket parts" practice is an imperfect analogy to PDS's purported invention: it entails periodic updates (instead of on-demand updates), and while Ubisoft suggests that a publisher could

---

[9] PDS also argues that its claims are "'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.'" *Id.* at 18–20 (quoting *DDR Holdings*, 773 F.3d at 1257, and citing *BASCOM*, 827 F.3d at 1349–52; *Amdocs*, 841 F.3d at 1300–02). Because there is no basis to conclude at this stage that the methods described in the complaint were routine and conventional at the time of patenting, the Court need not resolve whether the potential application of similar methods to non-digital data storage and transmission, such as in Ubisoft's analogy to a company sending partial catalog updates to its sales representatives in the field, differentiates the claims at issue from patents that have been held to satisfy step 2 of the *Alice* test based on their specificity to technological problems and contexts. It is worth noting that claims addressing digital data management have not uniformly survived this test. *See, e.g.*, *Content Extraction*, 776 F.3d at 1348; *but see Amdocs*, 841 F.3d at 1300 ("[T]his claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases).").

18

translate the format or language of pocket parts to meet its customers' needs, *see* Mot. at 10, the use of translation in this context—to the extent that it occurs at all—falls far outside the sort of general knowledge that can be considered without any evidence at the pleading stage.

Ubisoft also analogizes PDS's claims to the practice of a company sending only the updated portions of its catalog to sales representative in the field in preparation for meetings with clients. While that scenario leaves open the possibility of a more direct analogy to the patents at issue—the representative might make ad hoc requests for updates, as opposed to the periodic mailing of pocket parts, and it is conceivable that the company might convert its updates to different formats or languages to meet the needs of different representatives—the Court has no knowledge of any actual use of such a practice, much less any confidence that the common use of such a practice is "is generally known within [this] court's territorial jurisdiction." *Cf.* Fed. R. Evid. 201(b)(1) (addressing the requirements for judicial notice). Ubisoft contends that the patents themselves reveal such practices, but the relevant discussion in the patent specifications in fact presents this usage as an innovative application of the inventions, not as an already common practice (whether or not using digital networks as the means of transmission). *See* '947 Patent at 1:54–67; '236 Patent at 1:58–2:4. Ubisoft fails to present any cognizable basis for concluding that, contrary to PDS's allegations, PDS's claims involve activities that were well-understood, routine, and conventional in the data storage industry.

Defense counsel argued at the hearing that the '947 patent reveals that the sort of on-demand updates described therein were already in use, pointing to a passage describing systems that directly compared the client's version of the database to the server's version each time an update was requested. *See* '947 Patent at 2:9–17. As discussed in the patent specifications, such prior art does not establish common usage of the particular method at issue here—maintaining records of each revision on the server and determining which revisions occurred since the client's last update, in order to increase the efficiency of the updating process. *Id.* at 2:18–34.

The Federal Circuit's post-*Berkheimer* cases with similar procedural postures offer Ubisoft no refuge from the Court's decision today. In *Voter Verified*, no argument was made that the ordered combination of generic computer components transformed the claims into something

other than "well-understood, routine, or conventional" activity, and therefore the claims could properly be found invalid on a Rule 12(b)(6) motion. *Voter Verified*, 887 F.3d at 1386 ("Neither party disputes that the claims recite the use of general purpose computers that carry out the abstract idea."). In *Automated Tracking Solutions*, the plaintiff argued that the claims' components—not the ordered arrangement thereof—were non-conventional because they involved a developing technology. *Automated Tracking Sols.*, 723 F. App'x at 995. However, because the court found nothing in the complaint or specifications to support this contention, judgment on the pleadings remained proper. *Id.* Thus, both cases are inapposite to the dispute here, where PDS argues that the ordered arrangement of limitations in the claims provide the requisite unconventional solution, and Ubisoft has not shown the practices at issue to be conventional. In fact, another post-*Berkheimer* ruling only confirms that Rule 12(b)(6) dismissal is improper here. *See Aatrix Software*, 882 F.3d at 1127–30. In *Aatrix Software*, the court held that the plaintiff's concrete allegations that the claims improved computer functionalities and that the ordered combination of elements was not well-understood, routine, and conventional activity were sufficient to preclude dismissal at the Rule 12(b)(6) stage. *Id.* at 1128 ("[T]hat question [of whether the claim elements or the claimed combination are well-understood, routine, and conventional] cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.") Similarly, PDS concretely alleges that its purported invention improves data storage system efficiencies in a non-conventional manner and Ubisoft has not presented cognizable sources showing that allegation to be false. *See* Compl. ¶¶ 3, 4.

In a separate case alleging infringement of the same patents that PDS filed against Electronic Arts, Inc. in the Central District of California, Judge Kronstadt recently concluded that applying the second step of *Alice* to the patents at issue implicates "questions of fact that cannot be resolved on a motion to dismiss." *Pure Data Sys., LLC v. Elec. Arts, Inc.*, No. LA CV18-01097 JAK (KSx), slip op. at 6 (C.D. Cal. July 3, 2018).[10] This Court agrees with that conclusion.

---

[10] Both parties submitted the *Electronic Arts* order after briefing on the present motion had concluded. *See* dkts. 49, 50.

In sum, Ubisoft fails to sufficiently prove that the asserted claims, in the ordered arrangement of their elements, teach nothing more than "well-understood, routine, conventional activities previously known to the industry." *See Alice*, 134 S. Ct. at 2359. The Court cannot hold that the claims, as a matter of law, are directed to patent ineligible subject matter. Accordingly, Ubisoft's motion to dismiss on the basis of § 101 ineligibility is denied.

### D. Indirect Infringement

Ubisoft also seeks to dismiss PDS's indirect infringement allegations pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Mot. at 24–25. Ubisoft argues that PDS's indirect infringement claims should be dismissed because PDS pleads no facts that plausibly establish Ubisoft's knowledge of the '947 and '236 patents prior to their expiration date. *Id.* The Court agrees.

Under 35 U.S.C. § 271(b) and § 271(c), induced and contributory infringement, forms of indirect patent infringement liability, require "proof the defendant knew the acts were infringing." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015). The '947 patent was filed on May 27, 1997, and the '236 patent was filed as a continuation of that application, subject to the same twenty year patent term provision. '236 Patent (cover page paragraphs [ * ], [63]). Therefore, both patents expired on May 27, 2017—before PDS filed its complaint. While PDS alleges indirect infringement in its complaint, *see* Compl. ¶¶ 19, 46, 50, 76, PDS fails to allege any facts that plausibly show that Ubisoft, during the time the patents were in force, knew its acts were infringing, and PDS does not address this issue in its opposition brief. Instead, all of PDS's arguments are directed to the subject matter eligibility of its claims. Because PDS fails to plausibly allege knowledge as required for indirect infringement claims under § 271(b) and (c), these claims are dismissed with leave to amend.

/ / /

/ / /

/ / /

/ / /

/ / /

## IV. CONCLUSION

For the foregoing reasons, Ubisoft's motion to dismiss PDS's complaint is DENIED, with the exception of the indirect infringement claims, which are hereby DISMISSED with leave to amend. PDS may file an amended complaint no later than August 3, 2018.

**IT IS SO ORDERED.**

Dated: July 13, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge